UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| CITY OF LINCOLN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF THE AIR FORCE; UNITED STATES GENERAL SERVICES ADMINISTRATION; and DOES 1 through 100, inclusive,<br><br>Defendants. | No. 2:16-cv-1164-KJM-AC<br><br><br><br>ORDER |
|---|---|

In the early 1960s, the United States Air Force constructed and operated an intercontinental ballistic missile launch facility whose refuse was taken to a nearby landfill in the City of Lincoln. The City, alleging hazardous material within the refuse contaminates underground water today, sues for costs related to this ongoing contamination. The United States now moves to dismiss the City's Federal Tort Claims Act claims for lack of subject matter jurisdiction, which the City opposes. For the reasons discussed below, the court GRANTS the motion.

I.     BACKGROUND

    A.     Factual Background

Although the court finds below the dispositive issue is not intertwined with the merits, the recitation of facts here implicates substantive issues for which the court need not resolve factual disputes. *See Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) (quoting *Rosales*, 824 F.2d at 803) (where jurisdictional issues and substantive claims "intertwined," district court should employ summary judgment standard). Accordingly, the following facts are undisputed unless otherwise noted.

        1.     The Dump

Since 1952, the City of Lincoln has owned, operated and maintained a six-acre landfill ("Dump") in Placer County, California. Defs.' Statement of Undisputed Facts ("SUF") 1–4, ECF No. 22-2. From in or about 1961 to 1966, the Dump operated five days per week and received mixed refuse from local businesses and approximately 1,200 residences. SUF 11, 16–18. The Dump reduced its operations starting in 1971, ceased operations in 1976 and was enclosed with a low permeability cover in 1993. SUF 22–23, 25, 32; *see also* Pl.'s Statement of Disputed Facts ("SDF") 91, ECF No. 25-1.

        2.     The Launch Facility's Pre-Operational Period

In January 1960, the Army Corps of Engineers contracted with Peter Kiewit & Sons Co. ("Kiewit") to construct three Titan I Intercontinental Ballistic Missile ("ICBM") launch facilities near Beale Air Force Base and in the cities of Lincoln, Sutter and Chico. SUF 38; Defs.' Ex. 12 (CEBMCO Historical Summary) at 13, 17, 19, ECF No. 22-15. Around this time, the United States acquired the property on which it would locate the Lincoln facility (hereinafter, "the Facility"). *See* SDF 3; Pl.'s Ex. 7, ECF No. 25-13 (finding Air Force acquired 274.99 acres for facility in 1958); Pl.'s Ex. 3, ECF No. 25-9 (final judgment awarding United States ownership of property in April 1960).

Kiewit subcontracted much of the construction to other companies, including Superior Electric Construction Co., Inc. ("Superior"), which installed electrical systems. SUF 41, 43. After completing construction in early 1962, Kiewit transferred possession and control of the

facilities to Martin Company ("Martin"), which was then responsible for activating the launch facilities before delivering them to the Air Force. SUF 39, 45, 46; CEBMCO Historical Summary at 19, 34. On September 20, 1962, the Air Force accepted and took over the missile launch facilities from Martin. SUF 50.

The parties agree Superior disposed of refuse at the Lincoln City Dump, SUF 52, but dispute whether any other contractor also disposed of refuse at the Dump during this pre-operational period from January 1960 to September 1962. *See id.* The parties also dispute whether defendants' employees, including Army Corps of Engineer's Resident Office employees, Lincoln facility site inspectors and other Air Force personnel, disposed of refuse. *See* SDF 94.

### 3. The Launch Facility's Operational Period and Phase-Out

Once the Air Force took over the Facility in September 1962, the Air Force issued a plan for the Facility's routine daily maintenance. SUF 59; Defs.' Ex. 23 (Maintenance Plan), ECF No. 22-26. The Maintenance Plan gave Base Deputy Commander for Civil Engineering ("Base Deputy") responsibility for collecting and disposing of refuse from the Facility. SUF 61; Maintenance Plan at 42 ¶ 2(i). The Plan also established guidelines for collecting and disposing refuse. Maintenance Plan at 57 (Refuse Collection and Disposal Plan) ¶¶ (a)–(f).

Starting in September 1962, the City began collecting thirty-three-gallon cans of refuse from the Facility three times per week. SUF 65–67. The parties dispute the contents of this refuse and whether the contents were hazardous. *See* SUF 70–71; SDF 105–07; Pl.'s Objs. 2–4; Pasilla Dep. at 150:21–23. The City continued to collect the facility's refuse until at least January 1965, when the Air Force began deactivating the missiles and shutting down the Facility. SUF 73–76. As part of that process, Beale Air Force Base took over the Facility in Spring 1965, the Department of Defense sold the Facility's equipment and materials to the Hudson Company ("Hudson") in February 1966, and the United States transferred the property to Placer County in August 1968. SUF 76–90.

### 4. Administrative Regulation of the Dump

In 1991 and 2003, respectively, the California Regional Water Quality Control Board ("the RWQCB") issued a Waste Discharge Requirements ("WDR") order and then a

revised order for the Dump.  SUF 31; Defs.' Ex. 11 (RWQCB Order No. R5-2003-0142) at 1 ¶ 4, ECF No. 22-14.  The revised order required the City to maintain five feet of separation between groundwater and the bottom of the landfill, and to define how much of the groundwater contained total dissolved solids ("TDS") and volatile organic compounds ("VOC").  SUF 34.  In 2013, the RWQCB found the City had violated the revised order, that release from the Dump affected nearby groundwater quality, and that the City Dump failed to ensure the required five foot separation.  SUF 35; Defs.' Ex. 5 (RWQCB Order R5-2014-0703) at 2–4, ECF No. 22-8.  The RWQCB required the City to develop a Corrective Action Plan ("CAP") to maintain the minimum five foot separation, remediate groundwater impacts and maintain the landfill cover.  SUF 37; RWQCB Order R5-2014-0703 at 7 ¶¶ 31–33.

> B. <u>Procedural History</u>

On May 26, 2016, the City sued the United States, the United States Air Force and the United States General Services Administration for (1) Continuing Nuisance; (2) Continuing Trespass; (3) Equitable Indemnity / Contribution; (4) Cost Recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a); (5) Contribution under CERCLA, 42 U.S.C. § 9613; and (6) Declaratory Relief.  Compl., ECF No. 1.  The City's first two claims proceed only on a theory of continuing trespass and nuisance, not permanent trespass or nuisance.  *See* ECF Nos. 18, 11 (court order memorializing parties' stipulation).

On May 22, 2017, the United States filed the instant motion to dismiss the Federal Tort Claims Act claims, claims 1 to 3, for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Notice of Mot., ECF No. 22; Mem. P. & A., ECF No. 22-1.  The City opposed.  Opp'n, ECF No. 25.  The United States filed a reply.  Reply, ECF No. 29.  The court held a hearing on August 25, 2017, at which Keri Berman and Mark Rigau appeared for the United States and Jeff Orrell appeared for the City.  ECF No. 30.  With the court's permission, the United States filed a supplemental brief regarding the discretionary function exception discussed below, Sur-Reply, ECF No. 32, and the City responded, Response, ECF No. 35.

4

## II. STANDARDS

### A. Dismissal for Lack of Subject Matter Jurisdiction

A Rule 12(b)(1) jurisdictional attack may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Here, defendants' attack is factual because they rely on extrinsic evidence to challenge the complaint's allegations, including the City's allegation that defendants released hazardous substances into the Dump. *See Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (challenge was factual where United States filed declarations and affidavits challenging plaintiffs' allegations that the government owed them a legal duty); *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003) (cited in *Safe Air for Everyone*, 373 F.3d at 1039) (jurisdictional challenge was a factual attack where it "relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings").

How a court reviews a factual attack depends on whether the jurisdictional and merits issues intertwine. "Ordinarily, where a jurisdictional issue is separable from the merits of a case, the court may determine jurisdiction by the standards of a Rule 12(b)(1) motion to dismiss for lack of jurisdiction." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). In such circumstances, a court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, and make findings of fact concerning the existence of jurisdiction. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987). No presumption of truthfulness attaches to the plaintiff's allegations, *Rosales*, 824 F.2d at 803, but the court must nonetheless resolve any factual disputes in the plaintiff's favor, *Edison*, 822 F.3d at 517 (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)). The plaintiff retains the burden to establish the court's

subject matter jurisdiction. *Id.* (citing *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009)).

Rule 12(b)(1)'s relatively expansive standards, however, are inappropriate where issues of jurisdiction and substance "intertwine." *Roberts*, 812 F.2d at 1177. Instead, where the jurisdictional issue and substantive claims are "so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits," the district court should use a summary judgment standard. *Autery*, 424 F.3d at 956 (quoting *Rosales*, 824 F.2d at 803). The court should grant the motion to dismiss only if, while viewing the evidence in the light most favorable to the non-movant, the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1110, 1131–32 (9th Cir. 2003) (en banc); *Rosales*, 824 F.2d at 803. Where the intertwined factual issues are disputed, discovery should be allowed, *America West Airlines v. GPA Group, Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989), and the court should leave the resolution of the jurisdictional issues to the trier of fact. *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 922 (9th Cir. 2002); *Thornhill Pub. Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 735 (9th Cir.1979).

Here, the dispositive issue involves jurisdictional facts that are not intertwined with the substance of the City's case. The United States moves to dismiss in part based on the Federal Tort Claims Act's "discretionary function" exception, for which the court looks to applicable statutes, regulations or policies to decide whether the United States retained discretion to act. Because determining whether the defendants had discretion to act is separate from determining how they acted, the jurisdictional and substantive issues are not intertwined. Accordingly, the court reviews all relevant evidence to resolve any factual disputes, primarily related to construction of official manuals, concerning the existence of jurisdiction.

B. <u>Sovereign Immunity and the Federal Tort Claims Act</u>

The United States may not be sued without its consent, and the terms of its consent define the scope of the court's jurisdiction. *United States v. Mitchell*, 445 U.S. 535, 538 (1980).

The consent must be unequivocally express, not implied. *Id.* (citing *United States v. King*, 395 U.S. 1, 4 (1969)).

The Federal Tort Claims Act ("FTCA" or "the Act") provides a limited waiver of sovereign immunity. *United States v. Orleans*, 425 U.S. 807, 813 (1976). The Act makes the federal government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment. *Id.* Specifically, the United States may be liable "in the same manner and to the same extent as a private individual under like circumstances." *United States v. Olson*, 546 U.S. 43, 46–47 (2005) (quoting 28 U.S.C. § 2674); *see also* 28 U.S.C. § 1346(b)(1)[1]. Because the government is not a private actor, a court's job in applying the "like circumstances" standard is to find the most reasonable analogy. *LaBarge v. Mariposa County*, 798 F.2d 364, 367 (9th Cir. 1986) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955)).

The FTCA contains several exceptions to its waiver of sovereign immunity. *See* 28 U.S.C. § 2680(a)–(n). Under the "discretionary function" exception, the government may not be liable for acts grounded in public policy considerations that involve an element of judgment. *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (citing, *inter alia*, *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)); 28 U.S.C. § 2680(a) (excluding from liability "an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function"). This exception "insulates certain governmental decision-making from judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Myers v. United States.*, 652 F.3d 1021, 1028 (9th Cir. 2011) (internal citations omitted). "In other words, 'if judicial review would encroach upon th[e] type of balancing done by an agency, then the [discretionary function]

---

[1] Section 1346 gives federal district courts jurisdiction over claims brought against the United States involving injury or loss of property "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

exception' applies." *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002) (quoting *Begay v. United States*, 768 F.2d 1059, 1064 (9th Cir. 1985)).

The Supreme Court prescribes a two-part test for determining if the discretionary function exception applies. *See Gaubert*, 499 U.S. at 322–25; *Berkovitz*, 486 U.S. at 536–37. First, a court asks whether the challenged action was discretionary, "i.e., whether it was governed by a mandatory statute, policy, or regulation." *Whisnant v. United States*, 400 F.3d 1177, 1180–81 (9th Cir. 2005). This inquiry looks at the "nature of the conduct, rather than the status of the actor." *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (quoting *Berkovitz*, 486 U.S. at 536). The exception will not apply if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," and a mandatory directive ends the inquiry because the employee "has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. Second, if the action was discretionary, the court asks whether the challenged action is of the type Congress meant to protect, "i.e., whether the action involves a decision susceptible to social, economic, or political policy analysis." *Whisnant*, 400 F.3d at 1180–81 (citing *O'Toole*, 295 F.3d at 1033–34). If both steps are satisfied, the exception applies even if the ultimate decision reflects an abuse of discretion. *Terbush,* 516 F.3d at 1130 (citing 28 U.S.C. § 2680(a)). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 324–25.

The discretionary function exception should be read in light of the statute's purpose. "[T]he FTCA was created by Congress with the intent to compensate individuals harmed by government negligence, and as a remedial statute, it should be construed liberally, and its exceptions should be read narrowly." *Terbush*, 516 F.3d at 1135 (internal quotations omitted) (quoting *O'Toole*, 295 F.3d at 1037); *see also Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957). A plaintiff bears the burden of showing the court has subject matter jurisdiction under FTCA's general waiver of immunity. *Prescott v. United States*, 973 F.2d 696, 701-02 (9th Cir. 1992). The United States, however, has the burden of proving one of the FTCA's exceptions to the waiver of immunity applies. *Id.* at 701–02 (citing *Stewart v. United States*, 199 F.2d 517, 520

8

(7th Cir. 1952)); *see also Green v. United States,* 630 F.3d 1245, 1248–49 (9th Cir. 2011) (citing *Miller v. United States,* 163 F.3d 591, 594 (9th Cir. 1998) (where summary judgment standard applies, "[t]he plaintiff has the burden of showing that there are genuine issues of material fact as to whether the exception should apply, but the government bears the ultimate burden of establishing that the exception applies")); *cf. In re Camp Lejeune N. Carolina Water Contamination Litig.*, 1:11-MD-2218-TWT, 2016 WL 7049038, at *19 n.119 (N.D. Ga. Dec. 5, 2016) (noting a Circuit split[2] regarding which party has the burden to prove an FTCA exception applies).

III. DISCUSSION

As noted, the United States challenges this court's jurisdiction based on the "discretionary function" exception under the Federal Tort Claims Act. Applying the Supreme Court's two-part test, the court first evaluates whether defendants were governed by a relevant and mandatory statute, policy or regulation and, finding that they were not, whether the challenged action involved a decision susceptible to social, economic or political policy analysis. *Gaubert*, 499 U.S. at 322–25; *Berkovitz*, 486 U.S. at 536–37.

A. Mandatory Duties

The parties focus on the first step of the discretionary function inquiry, which asks whether a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. The United States argues the discretionary function applies to insulate actions both during the facility's pre-operational and operational phases. Mem. P. & A. at 24–28. During the pre-operational phase, the United States argues it

---

[2] The Ninth Circuit is not alone; other Circuits have concluded the United States bears the burden to prove the applicability of the discretionary function. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014); *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 (3d Cir. 2012). At least as many Circuits go the other way, however, and place the burden on the plaintiff to prove the exception does not apply. *See Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010); *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005); *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998). Others have declined to resolve the issue altogether. *Sharp ex rel. Est. of Sharp v. United States*, 401 F.3d 440, 443 n.1 (6th Cir. 2005) (declining to decide whether *Gaubert* altered its earlier view that the United States bears the burden); *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993).

9

had discretion to delegate disposal responsibilities to a contractor, and then a subcontractor, Superior. *Id.* at 24–25. During the operational phase, the United States argues Air Force regulations provided it with discretion to segregate or combine types of refuse. *Id.* at 25–28 (citing Maintenance Plan; Air Force Manual 85-11, ECF No. 25-32). In response, the City argues the discretionary function does not apply because: (1) the United States never has discretion to trespass, Opp'n at 20–21 (citing *Simons v. United States*, 413 F.2d 531, 534 (5th Cir. 1969)); (2) defendants' waste segregation requirements were mandatory, *id.* at 21–24 (citing Air Force Manual 85-14); and (3) recent discovery has revealed additional non-discretionary duties, including defendants' duty to use only approved disposal facilities, that defendants violated, *id.* at 24–26. The court addresses each of the City's arguments in turn.

          1.      <u>Trespass</u>

The City's first argument, that the government never has discretion to commit a trespass, is untenable given the sheer number of cases that have applied the discretionary function exception to bar trespass claims. *See Callahan v. United States*, 329 F. Supp. 2d 404, 410 (S.D.N.Y. 2004) (collecting cases); *see also Farms v. United States*, No. 94–1448, 1995 WL 914615 at *1–3 (S.D. Fla. Mar. 3, 1995); *Sauders v. S.C. Pub. Serv. Auth.*, 856 F. Supp. 1066, 1069, 1075 (D.S.C. 1994). In *Green v. United States*, for example, the Ninth Circuit held that the government's decision to apply DDT, a toxic pesticide, to federal grazing lands triggered the discretionary function exception and warranted dismissing plaintiff's trespass claim. 629 F.2d 581, 585–86 (9th Cir. 1980). The First Circuit also has rejected the City's argument in a case raising the question. *See Fagot Rodriguez v. The Republic of Costa Rica*, 297 F.3d 1, 10 (1st Cir. 2002) (rejecting argument that United States consuls had no discretion to violate Puerto Rican trespass law, explaining "if a tortious act were, by definition, non-discretionary, the discretionary functions exception would be a dead letter" and that such an argument "conflates an abuse of discretion with an absence of discretion"). As these cases demonstrate, a court's inquiry does not focus on whether the United States has discretion to trespass, but instead on whether the United States has discretion to engage in behavior that may cause a trespass, such as the decision to apply DDT or the decision to select a location for a consulate's office. *See also Callahan*, 329 F.

Supp. 2d at 410 (rejecting argument that United States Marshals Service, in providing protective services for a federal judge, never had discretion to trespass on plaintiffs' property).  Similarly here, the court focuses on whether the United States had discretion to determine how to dispose of hazardous waste, even if that conduct may have effected a trespass.

The court rejects the City's argument that the United States necessarily lacks discretion to trespass, and next turns the City's evidence that it says comprises applicable Air Force manuals prescribing a mandatory course of action as relevant in this case.

### 2. Air Force Manuals

To establish a mandatory duty, the City chiefly relies on Air Force manuals that it says created mandatory waste segregation requirements.  *See* Opp'n at 21–24 (citing Air Force Manual 85-11 (entitled "Refuse Collection and Disposal") (1956); Air Force Manual 85-14 (entitled "Maintenance and Operation of Sewage and Industrial Waste Plants") (1959)).

Three prior cases have analyzed these Air Force manuals' applicability.  *See OSI, Inc. v. United States*, 285 F.3d 947 (11th Cir. 2002); *Aragon v. United States*, 146 F.3d 819 (10th Cir. 1998); *Clark v. United States*, 660 F. Supp. 1164 (W.D. Wash. 1987), *aff'd,* 856 F.2d 1433 (9th Cir. 1988).  The two most recent, circuit decisions found the manuals created no mandatory duty.   In *Aragon*, the Tenth Circuit affirmed a district court's determination, made after a four-day bench trial on the issue of the discretionary function exception, that an Air Force base did not have a mandatory obligation to dispose of waste water so as to avoid groundwater pollution.  146 F.3d at 824–28.  In considering Air Force Manual 85-14, the court of appeals noted an agency manual is not necessarily entitled to the force and effect of law, *id.* at 824–25 (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)), and that the manual's express qualification that it is "intended for guidance" weighed heavily against finding any mandatory duty, *id.* (citing AFM 85-14, § E1.01 (Purpose and Scope)).  Looking at specific sections of AFM 85-14, as well as Air Force Manual 88-11 (entitled "Sewage, Refuse and Industrial Waste") (1956), the court found both manuals similarly emphasized principles rather than practices, and did not prescribe specific and mandatory waste water disposal methods or treatment procedures.  146 F.3d at 824–28.  Similarly, the Eleventh Circuit in *OSI* found the same Air Force manuals did not deprive the

United States of discretion in its operation of three solid waste landfills. 285 F.3d at 951–52. Essentially adopting *Aragon*, the Eleventh Circuit held the "waste disposal decisions at issue involve an element of judgment or choice." *Id.* at 952.

The third, district court decision, though affirmed by the Ninth Circuit at the time, must be disregarded in light of subsequent Superior Court decisions. In *Clark*, the district court determined that Air Force manuals contained "a mandatory requirement that the presence of groundwater and the possible effects on groundwater must be considered in the siting and operation of dumps and burn pits on an Air Force Base." 660 F. Supp. at 1172. As courts from this circuit and others have determined, *Clark* was decided prior to the Supreme Court's decisions in *Berkovitz* and *Gaubert*, and its analysis "strays significantly from presently accepted discretionary function analysis." *Shea Homes Ltd. Partn. v. United States*, 397 F. Supp. 2d 1194, 1200 (N.D. Cal. 2005) (quoting *Aragon*, 146 F.3d at 823 n.4); *see also OSI*, 285 F.3d at 952. In particular, *Berkovitz* provides that an obligation is mandatory only if a federal statute, regulation or policy "specifically prescribes a course of action for an employee to follow." 486 U.S. at 536; *see also Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001) ("We have repeatedly held that a general regulation or policy . . . does not remove discretion unless it specifically prescribes a course of conduct."). *Clark*'s finding that certain general principles must be followed in the decision-making process conflicts with and is superseded by *Berkovitz*'s requirement that a statute, policy or regulation spell out a specific course of action. *OSI*, 285 F.3d at 952. Thus, *Clark* may be disregarded as unpersuasive in light of intervening Supreme Court precedent. In sum, the only two persuasive decisions to analyze applicable Air Force manuals have found no mandatory duties with respect to the disposal of hazardous waste.

With these cases in mind, the court turns to the two manuals on which the City relies: AFM 85-11 (hereinafter, "the Refuse Manual") and AFM 85-14 ("the Industrial Waste Manual"). As did the Tenth Circuit in *Aragon*, the court here doubts each manual's legal force. 146 F.3d at 824–25. For example, the Refuse Manual's opening section declares its purpose is to "provide commanders of major and subordinate commands with information" and "is intended for the guidance" of relevant personnel. AFM 85-11 at 3; *id.*, § A1.01. Describing its content,

12

this manual provides "information on all practicable methods, procedures, and equipment applications to provide a basis for selecting a system of refuse collection and disposal to meet local Air Force requirements." AFM 85-11 at 3. In other words, the Refuse Manual guides and informs defendants on how best to do something, but does not necessarily require them to do something in a certain way. As the Tenth Circuit found in evaluating the Industrial Waste Manual, the language of the manual itself weighs heavily against finding it imposes any mandatory duty. *Aragon*, 146 F.3d at 824–25; *see* AFM 85-14, § E1.01 ("Because of the varied nature of industrial problems, principles rather than practices are emphasized.").

Even if the manuals could be binding in a general sense, the City has not shown how they created a mandatory duty here. The City argues, citing the definitions of "refuse" in the Refuse Manual and "liquid industrial waste" in the Industrial Waste Manual, that defendants had a mandatory duty to segregate the two waste types. Opp'n at 21–22. But these provisions indicate only that different manuals govern different waste types, not that the Air Force was without discretion in deciding how to treat them. *See* AFM 85-11 § A1.03(a) ("Refuse")[3]; AFM 85-14, § E1.04 ("Types of Industrial Waste")[4]. That the Industrial Waste Manual lists several types of industrial waste as a "primary concern" does not dictate how they should be treated. AFM 85-14, § E1.04(a)–(e).

The City also asks the court to draw a negative inference from omissions in the Base's Maintenance Plan. Because the Maintenance Plan references only a portion of AFM 85-11[5], the City argues, any discretionary authority the Air Force manuals otherwise confer must not

---

[3] The Refuse Manual defines "refuse" to include "all putrescible (subject to decomposition or rotting) and nonputrescible solid wastes, such as garbage, debris, rubbish, and solid market and industrial wastes. Not included in this term are sewage and liquid industrial wastes, which are covered in AFM 85-14, Maintenance and Operation of Sewage and Industrial Waste Plants and Systems." AFM 85-11, § A1.03(a).

[4] The Industrial Waste Manual describes several types of industrial waste that it identifies as "of primary concern," including "Cyanides"; "Chromium Compounds and Other Toxic Metals"; "Acids and Alkalies"; "Organic Solvents, Phenols, and Aniline"; and "Greases, Oil Emulsions, and Detergents." AFM 85-14, § E1.04(a)–(e).

[5] The United States points out that the Maintenance Plan contains a typo, referencing "AFR 85-11" rather than AFM 85-11. *See* Maintenance Plan at 57 ¶ (e) ("[P]ersonnel assigned to

be incorporated into the Facility's Maintenance Plan. The City's position is perplexing given its other arguments that the Air Force manuals generally apply. The manuals themselves defeat the City's argument, as the manuals apply "to all Air Force activities" over which the Air Force has real property maintenance responsibility, including the missile facilities here. *See* AFM 85-11 at 3; AFM 85-14 at 3.

Finally, the City argues for another negative inference, citing the Refuse Manual's definition of "Salvage or Salable Materials," AFM 85-11, § A1.03(b); because these items "should be segregated from other refuse," the City says defendants lacked discretion to segregate any other type of waste not mentioned. Even if such a logical leap were warranted, and it is not, the City's argument is essentially that the Air Force was required to dispose of the hazardous waste it complains of, but the United States cannot be liable for complying with a regulatory mandate. *Gaubert*, 499 U.S. at 324.

The City asserts mandatory duties it says it has recently discovered. It acknowledges these duties fall outside of the complaint. Opp'n at 24:18–20 (explaining the City will seek leave to amend[6] the complaint to allege the violations of these duties). The court is not restricted to the face of the pleadings, *McCarthy*, 850 F.2d at 560, but nonetheless finds the City's new allegations would not establish a mandatory duty. First, the City argues defendants were limited to using one of five types of approved disposal facilities, and the Lincoln Dump did not qualify. Opp'n at 25. In a sub-section entitled "Classification of Refuse Disposal Methods," the Refuse Manual does list five types of approved refuse disposal facilities. AFM 85-11, §

---

refuse disposal at the individual site will act in accordance with AFR 85-11, Part B1.03, i.e., cartons, containers, and cans will be crushed in the prescribed manner to conserve space."). As the United States points out, Air Force Regulation 85-11 involved unrelated matter and did not contain Part B1.03, whereas AFM 85-14, Part B1.03, entitled "Refuse Collection and Disposal," is directly on point. *See* Defs.' Exs. 44, 44-A; Pls.' Ex. 26. In any event, for the reasons discussed, the Air Force Manuals generally apply here.

[6] The City recently has filed a motion to amend the complaint. ECF No. 34. Because that motion provides bases for amendment not asserted here, including the City's allegations that the County of Placer should be added as a defendant due to its own hazardous waste contributions, the court need not defer deciding the instant motion.

14

D1.04(b)(1)–(5) (listing sanitary fill, incineration, pit burning, burn-and-cover and regulated dumping). But the Manual does not expressly limit defendants to these five types of disposal facilities. *See id.* Even if it did, the parties agree the Dump may fit at least one category, "pit burning." *Id.* § D1.04(b)(3); *see* SDF 115. The Refuse Manual in turn provides non-mandatory language regarding the design of burning pits. *Id.* § C3.02(a) ("Masonry burning pits should be designed to meet installation requirements by a responsible engineer."); *id.* § C3.02(b) ("The design of earthen burning pits depends on the terrain and the quantity of refuse to be burned."). The Refuse Manual does not provide a specific, mandatory duty regarding the use of disposal facilities. Second, the City argues defendants were subject to a mandatory duty to protect groundwater. Opp'n at 25–26. To the extent the City alleges a mandatory duty to consider the possible effects the siting and operation of dumps and burn pits has on groundwater, this argument is untenable after *Gaubert* and *Berkovitz*, as discussed above. To the extent the City's argument relies instead on state law, SDF 134, it has pointed to no specific state law limiting defendants' actions.

In sum, the City has provided no basis to conclude the United States was subject to any applicable, specific and mandatory course of conduct regarding its disposal of hazardous waste, either during the facility's pre-operational or operational phases.

B. <u>Policy Analysis</u>

Having found no mandatory duty, the court next determines whether defendants' actions involving the disposal of hazardous waste were of the type Congress meant to protect, "i.e., whether the action involves a decision susceptible to social, economic, or political policy analysis." *Whisnant*, 400 F.3d at 1180–81 (citing *O'Toole*, 295 F.3d at 1033–34). The court concludes the actions are covered, and thus that the discretionary function exception applies.

When an agent of the United States is afforded discretion to act, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Terbush*, 516 F.3d at 1130 (quoting *Gaubert*, 499 U.S. at 324). Even still, there "must be some support in the record that the decisions taken are 'susceptible' to policy analysis for the discretionary function exception to apply." *Id.* (citing *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997)

(declining to see the Navy's mission to "provide a defense to the Nation or to enforce its diplomatic efforts" implicated in a decision to install a handrail on a staircase)).

Numerous courts, analyzing the military's allocation of resources involving waste management during the 1950s and '60s, have found those decisions susceptible to policy analysis. *See OSI*, 285 F.3d at 953 ("Disposal of waste on a military base involves policy choices of the most basic kind. The nature of the military's function requires that it be free to weigh environmental policies against security and military concerns. (internal quotations and alteration omitted)); *Snyder v. United States*, 504 F. Supp. 2d 136, 143 (S.D. Miss. 2007), *aff'd*, 296 Fed. App'x 399 (5th Cir. 2008) ("[T]he timing of any disclosures regarding TCE and PCE contamination at Camp LeJeune would also implicate policy concerns that are grounded in policy discretion . . . ." (internal quotations and citations omitted)); *Shea Homes Ltd. Partn.*, 397 F. Supp. 2d at 1200 (Army Corps of Engineers' abatement of methane gas migration from Air Force base landfill "implicate[s] policy choices and decisions of the type that Congress intended to protect from judicial second guessing"); *cf. Aragon*, 146 F.3d at 826 ("The Base operated under military exigencies during World War II, the Korean Conflict, the Vietnam Conflict, and the Cold War. Operational decisions during this twenty-five year active period undoubtedly were subject to defense and security considerations which encompass the heart of military policy."); *In re Camp Lejeune N. Carolina Water Contamination Litig.*, 2016 WL 7049038, at \*26 ("As *OSI* and *Aragon* make clear, the direction of resources on a military base during the Cold War is a classic illustration of the kind of balancing of national security and economic policies that should be protected by the discretionary function exception.").

Specifically here, the actions referenced by the Air Force manuals and the facility's Maintenance Plan are susceptible to policy analysis. The Refuse Manual, for example, encourages "[c]onsideration [be] given to efficiency, economy, and safeguarding health and welfare in both operation and maintenance of facilities." AFM 85-11, § A1.01. The Maintenance Plan describes the mission of the missile launch facility "to provide rapid, high quality maintenance to keep the assigned SM-68 Titan missile weapon systems in an optimum state of combat readiness." Maintenance Plan at 5. The Base Deputy worked towards that mission in

executing the "Refuse Collection and Disposal Plan." Maintenance Plan at 57. The implementation of the manuals and Maintenance Plan implicates policy concerns regarding these objectives. *Whisnant*, 400 F.3d at 1180–81; *id.* at 1182 n.3 (citing *Miller*, 163 F.3d at 595–96) (policy concerns implicated where officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire). Unlike the City's contention, these decisions do not involve mere "maintenance" determinations. *Cf. Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir. 2007) (snow removal from a parking lot is "maintenance work" to which the discretionary function did not apply). Instead, they are decisions that "involved policy choices of the most basic kind." *Aragon*, 146 F.3d at 826; *see also Terbush*, 516 F.3d at 1134 (policies could be implicated where maintenance of wastewater facilities "involve a balancing of policy considerations, more complex decisions or outright replacement").

The United States has met its burden to establish the discretionary function exception under the FTCA because its disposal of waste involved an element of judgment and was grounded in public policy considerations. As a result, the United States has not waived its sovereign immunity, and the court lacks jurisdiction over the FTCA claims.

IV. <u>CONCLUSION</u>

The court GRANTS the motion to dismiss claims 1 to 3 of the complaint for lack of subject matter jurisdiction. Ordinarily a court should grant leave to amend unless it finds that amendment of the claim would be futile. *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). Here, the court finds the City's arguments that could be alleged in an amended complaint would not establish this court's jurisdiction, and amendment is thus futile. Accordingly, the dismissal here is without leave to amend. *See Ard v. F.D.I.C.*, 770 F. Supp. 2d 1029, 1041 (C.D. Cal. 2011) (granting dismissal based on discretionary function exception without leave to amend). The City may proceed on its remaining claims not addressed by this order. In light of the City's pending motion to amend, ECF No. 34, the City need not file an amended complaint consistent with this order now, but may wait to file any amendment until after the court resolves that new motion.

/////

This order resolves ECF No. 22.

IT IS SO ORDERED.

DATED: September 25, 2017.

_____
UNITED STATES DISTRICT JUDGE