1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CITY OF LINCOLN,                          No.  2:16-cv-1164-KJM-AC

12              Plaintiff,

13        v.                                    ORDER

14   UNITED STATES OF AMERICA, et al.,

15              Defendants.

16

17            In the early 1960s, the United States Air Force constructed and operated an

18   intercontinental ballistic missile launch facility whose refuse was taken to a nearby landfill in the

19   City of Lincoln.  The City, alleging hazardous material contained in the refuse pollutes

20   underground water today, sues for costs related to the ongoing contamination.  The United States

21   now moves for summary judgment on the City's CERCLA claims and the United States'

22   counterclaims against the City.  For the reasons discussed below, the court GRANTS the motion

23   in part and DENIES it in part.

24   ////

25   ////

26   ////

27   ////

28   ////

1

1    I.        BACKGROUND

2              A.       Factual Background

3                      The following facts are drawn from defendant United States' statement of

4    undisputed facts ("US SOF"), ECF No. 75-2, plaintiff City of Lincoln's ("City") responses to that

5    statement, City Response to US SOF, ECF No. 80-1, the City's statement of undisputed facts

6    ("City SOF"), ECF No. 80-2, and the United States' responses, US Response to City SOF, ECF

7    No. 84.  Unless otherwise noted, these facts are undisputed.

8                      1.        The Dump

9                      Since at least 1952, the City of Lincoln has owned, operated and maintained a six-

10   acre landfill ("Dump") in Placer County, California.  US SOF 1–3, 6.  From 1952 until at least

11   June of 1971, the Dump operated five days per week, received approximately 45 cubic yards of

12   waste per day, US SOF 8; City Response US SOF 8, and periodically burned waste in trenches at

13   the Dump, US SOF 9.  The Dump ceased operations in 1976.  City SOF 1.

14                     2.        The Launch Facility's Pre-Operational Period

15                     In January 1960, the United States Army Corps of Engineers Ballistic Missile

16   Construction Office began supervising the construction of the Lincoln Missile Complex ("Missile

17   Site"), using Peter Kiewit & Sons Co. as the primary contractor.  City SOF 5.  The parties dispute

18   whether United States personnel used cleaning solvents containing hazardous substances, such as

19   trichloroethylene ("TCE") at the Missile Site during the construction phase.  US Response City

20   SOF 11.  The Air Force accepted the constructed Missile Site from the contractors on

21   September 20, 1962.  City SOF 16.

22                     3.        The Launch Facility's Operational Period and Phase-Out

23                     The Missile Site began operations on September 20, 1962, with the primary

24   mission of maintenance and operations of the Titan 1 intercontinental ballistic ("ICBM") missile

25   by the 851st Strategic Missile Squadron.  US SOF 45.  Starting sometime after September 1962,

26   the City began collecting between three to five thirty- or thirty-three-gallon cans of refuse from

27   the Missile Site three times per week.  City SOF 18; US SOF 52, 56.  The parties dispute the

28   contents of this refuse and whether those contents were hazardous.  *See* City Response to US SOF

                                                    2

1   53–55.  The City continued to collect the facility's refuse until at least January 1965, when the

2   Air Force began deactivating the missiles and shutting down the facility.  City SOF 21; US SOF

3   57–58.  As part of that process, Beale Air Force Base took over the facility in Spring 1965, US

4   SOF 58, and the United States transferred the property to Placer County in August 1968.  US

5   SOF 63.  The United States has not identified any waste collector other than the City that

6   disposed of waste from the Missile Site during this time period, City SOF 21, except that items

7   such as used parts were collected by civilian contractors or returned to Beale Air Force Base, US

8   Response to City SOF 21.

9              4.       Administrative Regulation of the Dump

10             In 1991 and 2003, respectively, the California Regional Water Quality Control

11  Board ("the Regional Board") issued a Waste Discharge Requirements ("WDR") order and then a

12  revised order for the City's Dump.  US SOF 20, 27.

13             In the 1991 WDR, the Regional Board found that total dissolved solids ("TDS") in

14  the shallow groundwater at the Dump's southern boundary exceeded the California Secondary

15  Drinking Water Standards, US SOF 21, and required the City to monitor the groundwater for

16  TDS, electrical conductivity, chlorides and groundwater elevation, US SOF 22.  The parties

17  dispute whether TDS includes and/or results from the disposal of certain hazardous substances.

18  City Response to US SOF 22 (citing City Ex. 81 at ¶ 4 (Ex. 261 to Savage Depo.) ("Savage

19  Report") at 7[1]).  In accordance with the City's Final Closure Plan, a low permeability cover was

20  constructed over the Dump in 1993.  US SOF 23.

21             Having determined the 1991 WDR no longer adequately described the Dump, the

22  Regional Board issued a revised order in 2003, US SOF 27, which required the City to monitor

23  for Volatile Organic Compounds (VOCs), though the parties dispute whether or not this was

24  because VOCs had previously been detected at the Dump, U.S. Response to City SOF 206; US

25  SOF 29.  The Regional Board also required the City to monitor the groundwater level, expressing

26

27             [1] Citations to exhibits use the document's internal pagination.  Otherwise, any citations to
    page numbers refer to the CM/ECF pagination on the top right-hand corner.

28

3

1   concern there was a not a minimum of five feet of separation between groundwater and landfill

2   waste, as required by state law.  US SOF 28.  The 2003 WDR also reported that "elevated

3   concentrations of inorganic constituents," were detected in the groundwater down gradient of the

4   Dump, which included TDS and chloride. City Response to US SOF 30.  Accordingly, the

5   Regional Board required the City to establish and carry out a corrective action plan to address

6   "groundwater impacts" at the Dump, City Ex. 1 (2003 WDR) at 6.  *See* US SOF 31.  In 2014, the

7   Regional Board issued a cleanup and abatement order to the City for failing to comply with the

8   2003 WDR, at least in part because the five-foot separation between the Dump and the

9   groundwater was not being maintained.  US SOF 33–34.  The parties dispute whether this order

10  was based on the presence of VOCs at the Dump.  City Response to US SOF 33.  The order

11  required the City to comply with the 2003 WDR.  US SOF 36.  In response, the City hired

12  environmental consultants Holdredge & Kull to develop and implement a corrective action work

13  plan to address the issues raised by the order and the 2003 WDR.  US SOF 39–40.  In 2015,

14  Holdredge & Kull determined that VOCs were not detected "on a consistent basis to warrant

15  further action."  US SOF 42.

16          B.      Procedural History

17          On May 26, 2016, the City sued the United States, the United States Air Force and

18  the United States General Services Administration for (1) continuing nuisance; (2) continuing

19  trespass; (3) equitable indemnity/contribution; (4) cost recovery under the Comprehensive

20  Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9607(a), 9613(f)

21  ("CERCLA"); (5) contribution under CERCLA; and (6) declaratory relief.  Compl., ECF No. 1.

22  On May 22, 2017, the United States filed a motion to dismiss the Federal Tort Claims Act claims

23  for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), ECF No.

24  22-1, which the court granted, ECF No. 38.

25          The United States now moves for summary judgment of the City's remaining

26  claims: (4) cost recovery under CERCLA; (5) Contribution under CERCLA; and (6) declaratory

27  relief, as well as its counterclaim against the City for CERCLA contribution and declaratory

28  relief, *see* US Am. Answer, ECF No. 45.

1    II.        LEGAL STANDARD

2              A court will grant summary judgment "if . . . there is no genuine dispute as to any

3    material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

4    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

5    resolved only by a finder of fact because they may reasonably be resolved in favor of either

6    party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[2]

7              The moving party bears the initial burden of showing the district court "that there

8    is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*,

9    477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

10   that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio*

11   *Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

12   parts of materials in the record . . .; or show [] that the materials cited do not establish the absence

13   or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

14   support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

15   nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

16   material facts").  Moreover, "the requirement is that there be no genuine issue of material fact

17   . . . . Only disputes over facts that might affect the outcome of the suit under the governing law

18   will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis

19   in original).

20             In deciding a motion for summary judgment, the court draws all inferences and

21   views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

22   587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).   "Where the record taken as a

23   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

24   ////

25

26        [2] Rule 56 was amended, effective December 1, 2010.  However,  it is appropriate to rely
     on cases decided before the amendment took effect, as "[t]he standard for granting summary
27   judgment remains unchanged."  Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010
     amendments.
28

1    issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.*
2    *Co.*, 391 U.S. 253, 289 (1968)).

3            A court may consider evidence as long as it is "admissible at trial."  *Fraser v.*
4    *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  Admissibility at trial depends not on the
5    evidence's form, but on its content.  *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001)
6    (citing *Celotex Corp.*, 477 U.S. at 324).  The party seeking admission of evidence "bears the
7    burden of proof of admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir.
8    2002).  If the opposing party objects to the proposed evidence, the party seeking admission must
9    direct the district court to "authenticating documents, deposition testimony bearing on attribution,
10   hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in
11   question could be deemed admissible . . . ."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86
12   (9th Cir. 2010).  However, courts are sometimes "much more lenient" with the affidavits and
13   documents of the party opposing summary judgment.  *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240,
14   1243 (9th Cir. 1979).

15           The Supreme Court has taken care to note that district courts should act "with
16   caution in granting summary judgment," and have authority to "deny summary judgment in a case
17   where there is reason to believe the better course would be to proceed to a full trial."  *Anderson*,
18   477 U.S. at 255.  A trial may be necessary "if the judge has doubt as to the wisdom of terminating
19   the case before trial."  *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507
20   (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be
21   the case "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v. Aetna,*
22   *Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d
23   at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

24   ////
25   ////
26   ////
27   ////
28   ////

1    III.    DISCUSSION

2            A.    City's Claims Against the U.S.

3            The City brings a CERCLA claim for recovery of costs against the United States

4    under 42 U.S.C. § 9607(a)(3) and (4), which provide in relevant part:

5                    (3) any person who by contract, agreement, or otherwise **arranged
                     for disposal or treatment**, or **arranged with a transporter for**
6                    **transport for disposal or treatment**, of hazardous substances
                     owned or possessed by such person, by any other party or entity, at
7                    any facility . . . owned or operated by another party or entity and
                     containing such hazardous substances, and
8
                     (4) any person who accepts or **accepted any hazardous substances**
9                    **for transport** to disposal or treatment facilities. . . or sites selected
                     by such person, from which there is a release, or a threatened release
10                   which causes the incurrence of response costs, of a hazardous
                     substance, shall be liable for--
11
12                   . . . .

13                   (B) any other necessary costs of response incurred by any
                     other person consistent with the national contingency plan[.]

14    *Id.* (emphases added); Compl. ¶ 39.  On the same basis, the City also brings a claim for

15    contribution under CERCLA, Compl. at 15–16, and for declaratory relief on the defendants'

16    liability for response costs incurred and to be incurred in the future, Compl. at 17–18.

17            "To establish a prima facie case for cost recovery under CERCLA, a plaintiff must

18    prove that: (1) a polluting site is a 'facility' within the statute's definition; (2) the facility released

19    or threatened to release a hazardous substance; (3) the release caused the plaintiff to incur

20    necessary costs of response; and (4) the defendant falls within one of four categories of

21    potentially responsible parties."  *Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th

22    Cir. 2004) (citation omitted).  The City alleges the United States is liable as an arranger and a

23    transporter, Compl. ¶ 43, and the United States challenges both theories.  The United States

24    moves for summary judgment on all of the City's CERCLA claims, arguing the City cannot prove

25    the second and third elements.  Specifically, the United States argues no genuine dispute of

26    material fact exists regarding (1) whether the United States disposed of hazardous material at the

27    City's dump (i.e., whether defendant is a responsible party) and (2) whether the City's costs are

28    recoverable under CERCLA.  At hearing, plaintiff conceded there is insufficient evidence to

1  support a claim under the transporter theory.  Accordingly, the court addresses only arranger

2  liability below.

3                  1.                <u>CERCLA Claim under 42 U.S.C. § 9607(a)(3) ("Arranger Theory")</u>

4                 To establish liability under CERCLA, 42 U.S.C. § 9607(a)(3), the City must

5  ultimately prove the United States was responsible for disposing a hazardous substance at the

6  Dump, through its arrangement with the City.  *See Burlington Northern and Santa Fe Ry. Co. v.*

7  *United States*, 556 U.S. 599, 611 (2009) (holding "arranger" liability requires "intentional steps to

8  dispose of a hazardous substance").  The City need not prove the hazardous substances disposed

9  of by the United States caused the City's remediation costs, but it "must [] present evidence that

10  [the United States'] waste was shipped to [the] site and that hazardous substances similar to those

11  contained in the [United States]' waste remained present at the time of release."  *United States v.*

12  *Monsanto Co.*, 858 F.2d 160, 169 n.15 (4th Cir. 1988).  Circumstantial evidence can suffice to

13  prove liability, especially where, as here, "the passage of time has made direct evidence difficult

14  or impossible to obtain."  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112,

15  131 (2d Cir. 2010) (quoting *Franklin County Convention Facilities Auth. v. Am. Premier*

16  *Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001)); *see also Am. Int'l Specialty Lines Ins. Co.*

17  *v. United State*s, No. CV 09-01734 AHM RZX, 2010 WL 2635768, at *20 (C.D. Cal. June 30,

18  2010).

19                  a.        <u>The City's Evidence</u>

20                 The City offers circumstantial evidence that the hazardous substances present at

21  the Dump came, at least in part, from the Missile Site.  First, the City offers unrebutted evidence,

22  namely an expert report from the United States' expert, Dr. McLane, *see* City SOF 26, that

23  several of the hazardous substances present at the Dump also appeared at the former Missile Site.

24  City SOF 25,[3] 28–29.  Second, the City cites documentary evidence suggesting, at the very least,

25

26        [3] The United States' objections to the sources relied upon by the City, based on lack of
foundation, are overruled for the purposes of this motion.  *See* US Response City SOF 25

27  ("Several sources relied upon by the City lack foundation and are not admissible evidence[.]").
*See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) ("When

28  evidence is not presented in an admissible form in the context of a motion for summary judgment,

1  that Missile Site personnel used Trichloroethylene (TCE), one of the hazardous substances found

2  at the Dump.  City SOF 31.[4]  Third, the City cites evidence suggesting the red containers

3  identified by the United States were used to dispose of rags contaminated with hazardous

4  substances, including TCE.  City SOF 48.[5]  For this proposition, the City relies primarily on the

5  deposition of Weldon Conrad Lewis, who served in the Air Force and was stationed at the Missile

6  Site, namely Beale Air Force Base, during the relevant time period from April 1962 until

7

8  but it may be presented in an admissible form at trial, a court may still consider that evidence."
(citation omitted))

9  [4]  As support for this proposition, the City cites the following, for which the court uses the

10  document's original pagination, or, where there is none, the exhibit pagination, but not the
CM/ECF-imposed pagination: City Ex. 19 at 8:1–4, 10:23-25 (United States response to

11  interrogatory stating "Documents show that the Air Force may have used small quantities of
trichloroethylene ("TCE") in the Missile Facility to clean specialized equipment"); City Ex. 27 at

12  1 (2001 *Sacramento Bee* article describing TCE clean-up effort at Missile Site including
interview with environmental restoration project manager for the site); City Ex. 13, at 1–4 (EPA

13  Potential Hazardous Waste Site Preliminary Assessment stating "TCE was used by DoD to

14  prepare and maintain Liquid Oxygen Readiness at the Titan Missile Facility"); City Ex. 48 at 33–
34 (Exhibit page 21–22) (History of Air Force Logistics Command 1964–1965, including

15  memorandum re: Historical Report from Beale Air Force Base, listing "Tric squirt bottles" under
"Shakedown – ORI Necessary Equipment"); City Ex. 49 at 7-50 (Exhibit page 11), ¶ 7-24.b

16  (1964 Air Force Technical Manual, Field Maintenance, Launch Complex Facilities Console
instructing, "Clean electrical contacts with cloth moistened with trichloroethylene").

17          The court does not suggest every exhibit in the foregoing or following citations

18  would be admissible, nor that every document tends to suggest TCE was used at the Air Force
Base.  The court does conclude, however, that, taken together, the City's evidence tends to

19  suggest TCE was used at the Missile Site, and the content of these exhibits could likely be
presented in an admissible form at trial.  *See Burch*, 433 F. Supp. 2d at 1120 ("When evidence is

20  not presented in an admissible form in the context of a motion for summary judgment, but it may
be presented in an admissible form at trial, a court may still consider that evidence." (citation

21  omitted)).

22          The United States' argument that the City's references to military records must be
disregarded, because the City has not presented a "qualified expert on military practices" is not

23  well taken.  As the United States concedes, "the documents speak for themselves."  US Response
to City SOF 31.

24

25  [5] As evidence, the City cites (using the internal document pagination): City Ex. 61 (Lewis

26  Depo.) at 202:13–205:2, 205:14–206:18, 206:24–207:5 (testifying "paint or paint byproducts,
[and] rags" as well as "any rags that had flammable substances on them" were disposed of "into

27  the red can"); *see also id.* at 73:10–14 ("most solvents are combustible"); City Ex. 52 (Technical
Order 21M-HGM25A-1-1), at 30 (containing Air Force instruction to "treat all cleaning solvents

28  as flammable agents," including trichloroethylene).

September 1965.  City Ex. 61 (Lewis Depo.) at 14:17–25.[6]  Mr. Lewis testified he remembered

disposing rags that were used to clean machinery, sometimes using solvents, into red containers

or "can[s]."  *See id*. at 37:14–23.  Finally, it is undisputed that the City collected refuse from the

Missile Site, from 1962 to February, 1965, possibly longer.  US Response to City SOF 18; US

SOF 51.

     The parties offer no direct evidence explaining how the red containers were

disposed of from the Missile Site.  No witness has been able to recall how the red cans were

disposed of, and the United States has not been able to identify any other entity hired to dispose

of the red containers.  City SOF 55–56[7] ("There is no evidence of any Air Force personnel with

eyewitness knowledge as to how the wastes in the Red Cans were ultimately disposed of.").  To

raise a triable issue of fact regarding the disposal of the contents of the red containers, the City

relies on the following string of inferences: First, the United States' Statement of Facts "identifies

only two types of waste receptacles at the Missile Site: (1) the 5-gallon, self-closing, red cans

("Red Cans"), and one or more (2) 33-gallon, silver kitchen cans."  City Response US SOF 48

---

[6] When citing exhibits, the court uses the documents internal pagination unless otherwise noted.

[7] As evidence, the City cites (using internal pagination), among other items: City Ex. 72 (U.S. Initial Disclosures) at 2–5 (responding to City's request to name each individual likely to have discoverable information that United States may use to support its claims or defenses, United States does not appear to list anyone with responsibility for disposal of wastes generated at Missile Site other than the City's employees); City Ex. 63 (Cihla Dep.) at 73:2–74:7, 125:13–18, 203:15–22, 219:16–18 (former Missile Site employee testifying he does not recall any industrial waste plant at Missile Site nor any contractor hauling away industrial waste from Site, there was not a laundry at Site, and he never saw a landfill at Site); Lewis Dep. at 78:2–20, 242:6–243:3 (former Missile Site employee testifying he never saw a landfill at Missile Site and he never saw a truck to pick up rags for laundering); City Ex. 58 (Jones Dep.) at 50:13–18, 79:24–80:9, 159:22–160:2, 172:22–173:16 (former Missile Site employee testifying he never saw any outside contractors "topside at the missile site" and he does not recall ever seeing anybody empty the red cans nor any container where rags would be emptied into from red cans); City Ex. 18 (U.S. Response to City's Interrogatories (Set One)) at 12:1–4, 14:13–18:12 (responding to City's request to identify all contractors and their roles at Missile Site, United States does not name a contractor specifically responsible for waste disposal except City); City Ex. 12 (U.S. Response to City Requests for Admission) at 22:17–28 (responding to City's request for admission, stating United States "lacks sufficient knowledge or information to admit or deny that the garbage collected by the City from the MISSILE SITE contained any cleaning solvents").

1   (citing US SOF 48, 50).  Second, George Hawkins, a former employee at the Missile Site, only

2   ever recalled seeing trash hauled out of the Site by individuals dressed like cooks, who carried

3   trash out in large plastic bags, suggesting kitchen waste was disposed of in plastic bags.  *Id.*

4   (citing City Ex. 65 (Hawkins Dep.) at 106:3–109:12).  Third, the City waste haulers testified they

5   never saw any plastic trash bags when they collected waste from the Missile Site.  City Ex. 3

6   (Ojeda Depo.) at 31:3–19 (explaining he generally collected 30-gallon metal cans with no plastic

7   bags); City Ex. 5 (Pasillas Depo.) at 98:7–19 (same)).  Therefore, "[t]his leaves *only* the

8   *contaminated* trash from the Red Cans for the City's collection."  City Response US SOF 48

9   (emphasis in original) (citations omitted).

10                              b.       The United States' Evidence

11              The United States emphasizes the City "was unable to find a single percipient

12   witness or a single document to prove that the Air Force disposed of a hazardous substance at the

13   Dump," and therefore argues no genuine dispute of material fact exists as to the United States'

14   liability.  Mot. at 11.  The United States admits it contracted with the City to have refuse

15   transported from the Missile Site to the dump, but claims only the kitchen cans were collected,

16   and "there is absolutely no evidence that those cans ever contained a CERCLA hazardous

17   substance."  *Id.* at 12 (citing US SOF 55).

18              In support, the United States cites the depositions of City garbage collectors who

19   stated they collected waste from the Missile Site, but never detected chemical odors, observed

20   any hazardous items, nor do they recall seeing anything in the Missile Site's garbage that was

21   different from the waste picked up elsewhere in the city, US SOF 52–54; US Ex. 5 (Ojeda Dep.)

22   at 59:3–42, though one also testified he "had no idea what was in the cans" because he "didn't

23   look, you don't have time," Ojeda Dep. at 57:25–59:2.

24              Nevertheless, it is undisputed that "[w]astes consisting of rags, gauze, or other

25   materials used to wipe up spills of solvents, oil, fuel, or paint were placed in red 5-gallon, self-closing

26   containers."  US SOF 48.  Therefore, how the contents of the red containers was disposed is key to

27   the merits of the City's CERCLA claim.

28   ////

1

c.     Discussion

2

The City's CERCLA claims can be proven through circumstantial evidence

3 "especially where the passage of time has made direct evidence difficult or impossible to obtain."

4 *Niagara Mohawk Power Corp.*, 596 F.3d at 131.  Therefore, in this context, the absence of

5 evidence regarding the process for the red containers' disposal is not fatal to the City's case on

6 summary judgment, because the City has presented evidence to support the inferences that: TCE,

7 and possibly other CERCLA hazardous substances, was used at the Missile Site and disposed of

8 in the red containers; the discarded rags containing hazardous substances were not laundered or

9 disposed of onsite;[8] the City was the only entity collecting the Missile Site refuse; and therefore,

10 the City must have collected the contents of the red containers for disposal at the Dump, based on

11 the United States' arrangement with the City.  Though the City's evidence connecting the red

12 containers to the City's landfill is attenuated, when the court draws all reasonable inferences in

13 the City's favor, as it must at this stage, the evidence is sufficient to raise a genuine dispute of

14 material fact, especially given the absence of evidence showing directly how the red containers

15 were otherwise disposed of.  It is for the factfinder to weigh the parties' competing evidence and

16 determine whether the preponderance of the evidence supports the inferences the City advances.

17 Further, if there were any evidence of how the red containers were disposed, such evidence would

18 likely be in defendant's sole possession.  If such evidence were accessible at all, the United

19 States' failure to produce such evidence would give rise to an inference against the United States,

20 not the City.  *See Int'l Union, United Automobile, Aerospace and Agric. Implement Workers of*

21 *Am. (U.A.W.) v. N.L.R.B.*, 459 F.2d 1329, 1336 (1972) ("When a party has relevant evidence

22 within his control which he fails to produce, that failure gives rise to an inference that the

23 /////

24

_____

25 ⁸ *See* Cihla Dep. at 73:2–74:7, 125:13–18, 203:15–22, 219:16–18 (former Missile Site employee testifying he does not recall any industrial waste plant at the Missile Site nor any

26 contractor hauling away industrial waste from Site, there was not a laundry at Site, and he never saw a landfill at Site); Lewis Dep. at 78:2–20, 242:6–243:3 (former Missile Site employee

27 testifying that he never saw a landfill at Missile Site and he never saw a truck to pick up rags for laundering).

28

1    evidence is unfavorable to him." (citing 2 J. Wigmore, Evidence § 285 (3d ed.1940))).  In sum,

2    the absence of direct evidence of the disposal of the red containers is not fatal to the City's case.

3             Finally, while the United States emphasizes that the hazardous substances found at

4    the Missile Site could have come from elsewhere in the City, *see* Reply at 6 (citing US Ex. 11 at

5    8), such evidence goes to the weight of the City's evidence; it is not enough for the court to find

6    that no reasonable jury could find for the City.  Accordingly, at this stage, the City's evidence is

7    sufficient to raise a genuine issue of material fact as to whether the United States is liable under

8    CERCLA, and, accordingly, the United States' motion for summary judgment on this issue is

9    DENIED.

10                    2.    Recoverability of Costs

11            The United States also argues the City's CERCLA claims fail for a second

12   independent reason: the costs the City attempts to recover are not recoverable because (1) they

13   were not "necessary" to respond to the release of CERCLA hazardous substances, and (2) the

14   City has not substantially complied with the National Contingency Plan (NCP), as required to

15   recover costs under CERCLA.  Mot. at 16, 21.

16                    a.    Whether the City's Costs were "Necessary"

17            Under CERCLA, a party may only recover "necessary" costs incurred in

18   responding.  *See* 42 U.S.C. § 9607(a)(4)(B).  To survive summary judgment, the City need only

19   present enough evidence to raise a genuine dispute of material fact regarding whether it incurred

20   "some necessary response costs" in order "to meet the minimal threshold required for establishing

21   its CERCLA claims" against the United States.  *Mission Linen Supply v. City of Visalia*, No.

22   1:15-CV-0672 AWI EPG, 2019 WL 446358, at *16 (E.D. Cal. Feb. 5, 2019.  "Response costs are

23   considered necessary when an actual and real threat to human health or the environment exist[s]."

24   *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (internal

25   quotation marks, citation omitted).  Under the definition of "response" under CERCLA, response

26   costs include those incurred to clean up, "prevent or minimize the release of hazardous

27   substances," *see Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1116 (9th Cir. 2017) (quoting

28   /////

                                                    13

1    42 U.S.C. § 9601(4)), as well as the cost of "actions as may be necessary to monitor, assess, and

2    evaluate the release or threat of release of hazardous substances," 42 U.S.C. § 9601(23).

3                    i.       The United States' Evidence and Argument

4          The United States argues the bulk of the City's costs were incurred to address non-

5    hazardous substances, such as total dissolved solids ("TDS"), and these costs are not recoverable.

6    The United States admits the City has performed groundwater sampling for Volatile Organic

7    Compounds ("VOCs"), which are hazardous substances, but argues these costs are only a small

8    fraction of the total alleged costs, and the City has not segregated them from the total.  Mot. at 16

9    (citing SOF ¶¶ 36-43, 66, 82).

10         As evidence, the United States relies primarily on the 1991 and 2003 WDR and the

11    2014 Cleanup and Abatement Order, which define what the Regional Board required of the City.

12    *See* Mot. at 17–21.  First, the United States argues the 1991 WDR did not identify, or require

13    costs associated with, hazardous substances.  Mot. at 17 (citing, *inter alia*, US SOF 21–22).

14    Second, the 2003 WDR primarily: (1) required the City to rectify its failure to maintain a five-

15    foot separation between the Dump and groundwater, which is unrelated to hazardous substances,

16    Mot at 17–18 (citing US SOF 28, 43); (2) ordered the City to monitor the concentration of

17    "inorganic constituents" in the groundwater, which include "TDS and minerals," *id.* (citing US

18    SOF 30); and (3) required the City to "monitor for VOCs semiannually for at least two

19    semesters," *id.* at 19 (citing US Ex. 2 ¶ 24 at 6).  The United States appears to admit that the latter

20    cost would be recoverable under CERCLA, if the City could establish the requisite causality.

21    Mot. at 19 ("[T]he City has performed limited groundwater sampling for Volatile Organic

22    Compounds ("VOCs"), which are hazardous substances.").

23         Finally, the United States argues the 2014 Cleanup and Abatement Order "did not

24    cite" CERCLA, but rather found the City was in violation of the 2003 WDR for failure to

25    maintain adequate separation between the Dump and the groundwater, and found an excess of

26    bicarbonate, chloride, nitrogen, and sulfate in the groundwater.  Mot. at 19–20 (citing US Ex. 4 at

27    2–4).  Other than sampling, the City has not incurred costs to address VOCs in the soil or

28    groundwater at the Dump, the United States argues, and these sampling costs are the only ones

1  recoverable because they are the only costs that were "necessary" to address hazardous

2  substances. *Id.* (citing US SOF 42–43, 79, 82).

3                              ii.       The City's Evidence and Argument

4           The City argues the costs from sampling the groundwater for VOCs are considered

5  "necessary" under CERCLA because VOCs are hazardous substances, a proposition on which the

6  parties appear to agree. Opp'n at 15 (citing Mot. at 16 ("Since 2003, the City has performed

7  limited groundwater sampling for Volatile Organic Compounds [], which are hazardous

8  substances.")). The City argues the costs are "necessary" particularly because they were incurred

9  to comply with the Regional Board's directive in the 2003 WDR. Opp'n at 16; City SOF 22, 97;

10  *see* City Ex. 1 (2003 WDR) at 27–28 (summary of monitoring and reporting frequencies,

11  including "constituents of concern"); *id.* at 29 (listing "Volatile Organic Compounds" as one of

12  the "Constituents of Concern").

13                             iii.       Conclusion

14          Sampling and monitoring costs of hazardous substances are generally recoverable

15  under CERCLA. *See Vill. of Milford*, 390 F.3d at 934 (citing 42 U.S.C. § 9601(23) ("removal"

16  includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat

17  of release of hazardous substances.")). The City's evidence, bolstered by the United States' own

18  concession regarding the VOC monitoring costs, is sufficient to create a genuine dispute of

19  material fact regarding whether at least some of the City's costs were "necessary" to respond to

20  hazardous substances, and are therefore recoverable under CERCLA.

21                       b.       Whether the City was in Substantial Compliance with the NCP

22          To survive summary judgment on a CERCLA claim, a plaintiff must present

23  enough evidence to raise a triable issue of fact regarding whether it substantially complied with

24  the National Contingency Plan (NCP) when it undertook its response efforts. *See Carson Harbor*

25  *Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1154 (C.D. Cal. 2003), *aff'd sub nom. Carson*

26  *Harbor Vill. v. Cty. of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006) (*Carson Harbor II*); 40 C.F.R.

27  § 300.700(c)(3)(i). The NCP "specifies procedures for preparing and responding to

28  contaminations and was promulgated by the Environmental Protection Agency (EPA) pursuant

15

1    to CERCLA § 105." *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th

2    Cir. 2010) (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 n.2 (2004)). "It is

3    designed to make the party seeking response costs choose a cost-effective course of action to

4    protect public health and the environment." *Carson Harbor II*, 433 F.3d at 1265 (citation

5    omitted). Response costs are considered consistent with the NCP "if the action, when evaluated

6    as a whole, is in substantial compliance" with it. *City of Colton*, 614 F.3d at 1003 (quoting 40

7    C.F.R. § 300.700(c)(3)(i)); *see also Waste Management of Alameda County, Inc. v. East Bay*

8    *Regional Park District*, 135 F. Supp. 2d 1071, 1100 (N.D. Cal. 2001) (EPA shifted to this flexible

9    "case-by-case" standard "to avoid discouraging private parties from cleaning up hazardous wastes

10   for fear that recovery of their costs would later be precluded by less than perfect compliance with

11   the NCP" (citing 55 Fed. Reg. 8792–94)). The EPA has specifically rejected a checklist approach

12   to NCP compliance, because "a list of rigid requirements [might] serve to defeat cost recovery for

13   meritorious cleanup actions based on a mere technical failure by the private party." *Carson*

14   *Harbor Vill., Ltd.*, 287 F. Supp. 2d at 1160 (citing 55 Fed. Reg. 8792–94).

15                    i.      The United States' Evidence and Argument

16          The United States argues the City has not substantially complied with the NCP,

17   and therefore none of its costs are recoverable under CERCLA. Mot. at 21–25. In support of this

18   argument, the United States offers the expert report of Dr. McLane, who "reviewed the

19   documentation of the actions taken by the City to comply with Title 27 Regulations and the 2003

20   WDR and noted that several of the NCP requirements were not met." Mot. at 21–22.

21   Specifically, Dr. McLane concluded that the City failed to:

22          identify Applicable or Relevant and Appropriate Requirements
             ("ARARs") for the Dump; failed to perform a Remedial Preliminary
23          Assessment ("PA") and/or a Remedial Site Inspection ("SI"); failed
             to perform a formal Remedial Investigation ("RI"), including the
24          failure to identify ARARs as part of the Feasibility Study ("FS")
             process; failed to prepare a proper FS; and failed to fulfill the
25          community relations and public interest provisions of the NCP.

26   *Id.* at 22 (citing US SOF ¶¶ 69–72); *see* City Ex. 44 (McLane Report) at 22–25; *see generally* US

27   Ex. 28 (McLane Depo.). Additionally, the United States offers the testimony of Wiley Wright,

28   Certified Public Accountant, to show the City failed to comply with the NCP's requirement to

                                                  16

1   provide an "accurate accounting" of the costs sought, by, for example, failing to provide

2   sufficient documentation of the relevant expenses and payments made.  Mot. at 23–24 (citing US

3   SOF 79–82).

4                              ii.        The City's Evidence and Argument

5              The City primarily argues that its cooperation with the Regional Board and the

6   agency's control over and direction of the City's corrective measures show the City was in

7   substantial compliance with the NCP.  *See* Opp'n at 22–23; City Response to US SOF 69–76.  As

8   to the accurate accounting requirement, the City argues that it is only required to provide

9   documentation to support the costs it seeks, and it has provided at least enough documentation to

10  support some of the sought costs.  *See* Opp'n at 24–26; City Response to US SOF 79.

11                             iii.        Discussion

12             In a recent case from this district, *Mission Linen Supply v. City of Visalia*, No.

13  1:15-CV-0672 AWI EPG, 2019 WL 446358 (E.D. Cal. Feb. 5, 2019), *aff'd*, No. 19-15392, 2020

14  WL 2917272 (June 3, 2020), a colleague analyzed whether a defendant was substantially

15  compliant with the NCP following a bench trial.  In that case, the court observed that, generally,

16  consistency with the NCP is unnecessary to recover initial investigation and monitoring costs, *id.*

17  at *13 (collecting cases), and at least one other district court has held the public participation

18  requirement is inapplicable to monitoring and investigative costs, *id.* at 16 n.13 (citing *United*

19  *Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 997 (C.D. Cal. 2011)).  Nonetheless, the court in

20  *Mission Linen* ultimately found the plaintiff's "close involvement and cooperation" with the

21  California Department of Toxic Substances Control in connection with that agency's regulatory

22  actions against the plaintiff and the resulting voluntary consent order was sufficient to show

23  substantial compliance with the NCP.  *Id.*

24             Similarly, viewing the City's actions "as a whole" and eschewing the "checklist

25  approach," *Carson Harbor Vill., Ltd.*, 287 F. Supp. 2d at 1160, there is at least a genuine dispute

26  of fact over whether the City's actions were also substantially in compliance with the NCP,

27  particularly because those actions were mandated by the Regional Board.  *See* City SOF 245–51.

28  For example, the Regional Board set specific requirements for the Dump and demanded ongoing

monitoring, making the requirement to "identify Applicable or Relevant and Appropriate

Requirements" unnecessary to show substantial compliance using a holistic approach.  *See* Opp'n

at 22; City SOF 245–46; City Response US SOF 69; *R.E. Goodson Const. Co. v. Int'l Paper Co.*,

No. CIV.A.4:02-4184RBH, 2006 WL 4916336, at *34 (D.S.C. Dec. 15, 2006) (finding claimant's

technical failure to identify applicable or relevant and appropriate requirements not a bar to

recovery where removal action, "when evaluated as a whole under the existing circumstances[,]

achieve[d] substantial compliance with the NCP," particularly due to Army Corps of Engineers'

involvement).   Furthermore, the City has provided sufficient documentation to support at least

some of the costs it has incurred.  *See, e.g.*, City SOF 276 (describing invoice from Earthtec for

1989 work associated with well digging and sampling) (citing City Ex. 91 (July 31, 1989 Earthtec

Invoice); City SOF 281–82 (describing invoices from Applied Engineering and Geology, Inc.

("AEG") for monitoring costs and at least one City check paying AEG invoice 4423) (citing City

Ex. 156 (AEG invoice 4423 dated April 15, 2013); City Ex. 157 (City check dated May 10, 2013

to AEG for invoice 4423)); *Santa Clara Valley Water Dist. v. Olin Corp.*, 655 F. Supp. 2d 1066,

1078 (N.D. Cal. 2009) (denying defendant summary judgment because plaintiff presented time

sheets and project codes, which was sufficient to create disputed fact) (citing 40 C.F.R.

§ 300.160(a)(1) (requiring documentation sufficient to provide accurate accounting of private

party costs incurred for response actions)).

Specifically regarding the NCP's public participation requirement, the Ninth

Circuit has suggested that "active participation by the [Regional Board] . . . could fulfill the

public comment requirement of the National Contingency Plan."  *Carson Harbor II*, 433 F.3d at

1267.  In *Carson Harbor II*, the court found the plaintiff, a private entity, had not substantially

complied with the public comment requirement, despite the Regional Board's involvement,

because the Regional Board was "involved in a very limited fashion."  *Id.*  Rather, the agency

merely approved the plaintiff's proposed remedial action plan with minor modifications.  *Id.*  The

court contrasted this with the facts of *Bedford Affiliates v. Sills*, 156 F.3d 416 (2d Cir.1998),

where plaintiff substantially complied with the NCP, because the public agency "negotiated two

consent decrees" with the plaintiff, oversaw the cleanup efforts, and was present when the

1    plaintiff conducted a preliminary investigation of the pollutants at the property.  *Carson Harbor*

2    *II*, 433 F.3d at 1267 (citing *Bedford Affiliates v. Sills*, 156 F.3d at 428, *overruled on other*

3    *grounds by W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 90 (2d Cir.2009)).

4             By the standard suggested in *Carson Harbor II*, the City has provided sufficient

5    evidence to create a triable issue of fact regarding whether it substantially met the public

6    comment requirement of the NCP.  First, the City is itself a public entity and was necessarily

7    involved in the efforts at issue in this case.  Second, the City provides evidence showing the

8    extensive involvement of the Regional Board, another public agency, including the Regional

9    Board's involvement in the Dump's closure in the 1980s and 1990s, as well as in the City's

10   monitoring and investigation of substances at the Dump, and in reviewing and approving the

11   remedial action.  *See* Opp'n at 14–15; City SOF 244–50, 251 ("The City and its consultants

12   provided regular correspondence updates and reports to the Regional Board during the process of

13   investigating and monitoring contaminants, characterizing the Landfill, and selecting, developing

14   and constructing a remedial action.").  Third, the City presents evidence that the City Council

15   held meetings relevant to the City's actions in public and publicized details of some of the work

16   being done on its public website.  *See, e.g.*, City SOF 87– 89, 107, 113–14, 233–34 ("The City

17   also included Landfill Requests for Proposals (RFPs), describing the nature of the work occurring

18   at the Landfill, in various publications, including the *Lincoln News Messenger*, the City's website

19   and City Council agendas."), 235–39, 241.  The City's evidence suggests the Regional Board was

20   far more involved in the City's efforts than the agency was in *Carson Harbor II* and that the

21   City's process itself involved the public to a degree.  This evidence is sufficient for the City to

22   survive summary judgment with respect to compliance with the NCP.

iv.    <u>Conclusion</u>

24           For the foregoing reasons, the United States' motion for summary judgement

25   regarding the City's CERCLA claims is DENIED.

26       B.    <u>Counterclaims Against the City</u>

27           The United States also moves for summary judgment on its counterclaim against

28   the City, *see* ECF No. 45 at 17 (counterclaim for CERCLA contribution), arguing there is no

1    genuine dispute of material fact that the City is the owner and operator of the Dump, and is

2    therefore liable for cleanup costs associated with hazardous substances at the Dump.  Mot. at 8

3    (citing 42 U.S.C. §§ 9607(a)(1),(2); *United States v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188,

4    1198–99 (E.D. Cal. 2008) (granting motion for summary judgment on CERCLA "owner"

5    liability)).  Though the City "does not deny that it operated the [Dump], nor that it still owns [the

6    Dump]," Opp'n at 27, it argues the court should deny summary judgment, because the United

7    States cannot show the United States incurred any response costs, *id.* (citing 42 USC

8    §9607(a)(4)).  The City adds, "even if the City is found liable, the USA bears the burden at trial

9    of demonstrating a reasonable basis for apportionment, in order to avoid joint and several

10   liability."  *Id.* at 27 n.9 (citing *Burlington Northern and Santa Fe Ry. Co.*, 556 U.S. at 614–615).

11          "CERCLA provides two distinct causes of action [:] Section 107(a) provides for a

12   right to recovery of costs incurred in cleaning up a site, while § 113(f) provides a defendant in a

13   § 107(a) suit a right to contribution from other potentially responsible parties [] with whom the

14   defendant shares common liability."  *Litgo New Jersey, Inc. v. Martin*, No. CIV. 06-2891 AET,

15   2012 WL 32200, at *2 (D.N.J. Jan. 5, 2012) (citations omitted), *aff'd in part sub nom. Litgo New*

16   *Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 379 (3d Cir. 2013).  The

17   United States' counterclaim asserts the City is liable for contribution costs under § 113(f), in the

18   event the United States is held liable under § 107(a).  *See* US Am. Answer at 17 ¶ 20 (" If the

19   City is able to establish that the United States is liable in this action, the Court should allocate the

20   response costs sought by the City among the parties, including the City as the current owner and

21   operator of the Landfill . . . .").  The City's argument that the United States' claim fails because it

22   has not incurred response costs of its own is therefore unavailing; the United States is merely

23   claiming the City is at least partially responsible for the City's response costs.  Opp'n at 27.  The

24   United States is correct that there is no dispute of material fact over whether the City is liable as

25   the owner and previous operator of the Dump, and the City essentially concedes this point.

26   Opp'n at 27; *see* 42 U.S.C. § 9607(a)(1),(2).

27          The United States' motion for summary judgment on this counterclaim as framed

28   in the United States' pleading is GRANTED.  However, this finding does not preclude the

20

1  possibility of the City's prevailing at trial on its claim for damages against the United States,

2  because, under CERCLA, liable parties can be held "jointly and severally liable for the entire

3  harm to the site, even though other parties may have contributed to the environmental harm."

4  *Litgo New Jersey, Inc.*, 2012 WL 32200 at *11.

5  IV.    <u>CONCLUSION</u>

6         For the foregoing reasons, the United States' motion for summary judgment on the

7  City's CERCLA claims is DENIED, and its motion on the United States' counterclaim against the

8  City is GRANTED as set forth above.

9         IT IS SO ORDERED.

10  DATED:  August 28, 2020.

11

12  CHIEF UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28